[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for injunctive relief wherein the plaintiff, William J. Campbell, Director of Health of the City of Danbury, seeks injunctive relief against the defendant owner of two rental units to abate violations of section 19a-111-5(b), the state lead paint regulation for dwellings.
A permanent injunction is one that can be granted only at a final hearing on the merits, and which is usually perpetual in effect. 42 Am.Jur.2d Injunctions 9 (1969); see UnitedStates v. Baltimore Ohio R.R., 225 U.S. 306, 322,32 S.Ct. 817, 56 L.Ed. 1100 (1912).
A judge retains a reasonable discretion to decide whether injunctive relief is appropriate, even though authorized by statute. Burns v.Barrett, 212 Conn. 176, 194, 561 A.2d 1378 (1989).
Because the lead paint inspector the defendant hired to prepare an abatement plan also offered to do the work, the injunction sought to enforce compliance with the plan is denied.
This tale begins when at the suggestion of Mr. Melillo of the Danbury Health Department, the defendant, who knew no one in the lead paint inspection business, engaged Enviro Science Consultants, Inc. of Newington. The State Department of Health and Addiction Services has never designated any "certified lead abatement contractor" as defined under its regulations. Enviro Science's report, dated May 6, 1993, indicated that "Toxic levels of lead in a defective condition were found in the property, and a child under the age of six resides at the property and either lives in the dwelling unit where defective toxic surfaces exist or has access to the common areas and exteriors where these types of surfaces exist." The report was signed by Mr. David CT Page 5939 Beloin and Mr. Neal B. Frenden. Beloin described himself as "Senior Environmental Consultant" and Frenden as "Principal/Master Lead Inspector." Enviro Science also offered its availability to perform the work. The defendant Groves priced this work recommended by Enviro Science and found that the cost would be approximately $90,000.
The following facts are not in dispute. The plaintiff Campbell, acting in his official capacity as Director of Health, ordered the defendant to abate lead based surfaces located within both apartments and on the exterior of premises owned by the defendant and located at 10 Foster Street, Danbury. The defendant, a resident of Armonk, New York, did not appeal this violation notice to the State Department of Health "within forty-eight hours after the making of such order" as section 19a-229 of the statutes would have permitted him to do. The abatement order was issued pursuant to section 19a-111-3(f) of the regulations of Connecticut State Agencies, and General Statutes, Secs.19a-206 (a), 19a-111c, 19a-230, and 19a-206(b)(2).
There has been no compliance with the abatement order as of April 15, 1994.
Nordo Tolentino, an official of the State Department of Health, testified that the State Department of Health interprets its regulations in the following manner. Where lead is found in an intact surface and no child under six lives in the premises and none has elevated levels of lead in his or her blood, only a lead management plan is required. Where a person of any age has such elevated blood levels and there is a defective surface consisting of peeling, flaking, chalking, or chipping paint or paint found over crumbling or cracking or falling plaster, etc., the defect must be abated. Where a child under six with such an elevated blood level turns seven and such a defective surface requires abatement, continued abatement will be required by unwritten departmental policy even if the child turns seven. The State health Department has not yet certified lead abatement contractors and inspectors. Nordo Tolentino testified that a person whose only experience was that of a dump truck driver could qualify as a lead paint inspector. Young Mr. Shawn Fitzgerald, born September 17, 1987, was under six as of September 17, 1993 and occupies the first floor apartment. The defendant Groves bought the property in 1991. He rehabilitated almost the entire house. The Danbury Health Department issued him and after the it a certificate of approval for rental. Nonetheless, after doing so, premises were occupied by a tenant, proceedings concerning the abatement of lead paint hazards commenced.
Having heard the evidence, the court further finds that the CT Page 5940 plaintiff is Director of Health of the City of Danbury, Connecticut, and as such is charged with the enforcement of sections 19a-36, 19a-37,19a-206 and 19a-207 of the Connecticut General Statutes, and of the Housing Maintenance and Occupancy Code of Danbury (Ordinance No. 241, 3-6-79).
The defendant has filed the following special defenses: (1) Lack of subject matter jurisdiction because a Certificate of Apartment Occupancy for the premises had been issued previously by the plaintiff and/or his agency and conditions had not substantially changed since that event; (2) plaintiff has misapplied the enforcement provisions of the Connecticut State Regulations, sections 19a-111-1 through 19a-111-11; specifically with respect to the identification and abatement versus monitoring requirements pertaining to "intact surfaces," "chewable surfaces" and "defective surfaces" as defined in the Connecticut State Regulations; (3) plaintiff has not properly applied the enforcement provisions of the Connecticut State Regulations, sections 19a-111-1
through 19a-111-11; specifically with regard to the initial inspection criteria utilized by plaintiff; (4) sections 10-4 (5)(b)(c) and (d) of the Housing Maintenance and Housing Code of Danbury are unconstitutionally vague; (5) estoppel because a Certificate of Apartment Occupancy had been issued previously by the plaintiff and/or his agency and conditions had not substantially changed since that event; (6) waiver because a Certificate of Apartment Occupancy had been issued previously by the plaintiff and/or his agency and conditions had not substantially changed since that event; (7) plaintiff lacks jurisdiction in this matter as he has not properly applied the enforcement provisions of the Connecticut State Regulations, sections 19a-111-1
through 19a-111-11; specifically with regard to the lead inspection report utilized by plaintiff in that any such report was not prepared and could not be prepared by a "certified lead inspector" as defined in such regulations as there presently do not exist any such inspectors as defined under such regulations; (8) it is impossible for defendant to comply with any alleged abatement order under the enforcement provisions of the Connecticut State Regulations, sections 19a-111-1 through19a-111-11, as there presently exists no "certified lead abatement contractor" as defined under such regulations.
The court will now address the defendant's special defenses. The court will first take up the defendant's claim of impossibility of performance by virtue of the failure of the State Department of Health and Addition Services to have designated a "certified lead inspector" and a "certified lead abatement contractor" as defined under such regulations. Compliance by the defendant is possible since section19a-111-9 does not require certification of lead inspectors or CT Page 5941 contractors. The court rejects this defense. The defendant had no trouble finding an expert at trial who was able to examine the paint.
The court rejects the defendant's arguments that it is impossible to comply with the abatement order made pursuant to the Connecticut State Regulations, sections 19a-111-1 through 19a-111-11, as there presently exists no "certified lead abatement contractor" as defined under such regulations.
Section 19a-111-3 of the regulations provides for the manner of inspections. It indicates only that "lead inspectors" may conduct inspections without reference to the term "certified lead inspectors."
The definition of lead abatement plan in subsection (OO) of section19a-111-1 of the regulations does not state that the inspection must be done by a "certified lead inspector." The court, therefore, rejects the impossibility defense. Turning to a related defense, the court holds that based on this same reasoning, defendant's claim that there is a lack of jurisdiction because of the failure to certify "certified lead inspectors" is without merit. The law simply does not require certification. It says the department "may" certify.
The plaintiff makes a similar claim of lack of jurisdiction because of the failure of the commissioner to certify any lead abatement contractors. The regulations do not require the work to be done by a certified contractor, nor do they require the commissioner to establish a certification. Section 19a-111-9 is permissive and not mandatory in that it says such contractors "may be certified." The court rejects these contentions and rules it has jurisdiction.
The defendant's waiver and estoppel defenses are interrelated. As to each, the defendant respectively contends that by virtue of granting a certificate of apartment occupancy, the plaintiff waived or gave up the right to continue to regulate the lead paint content of the premises, because whatever conditions existed at the premises were there when the apartment occupancy certificate was issued. In enacting provisions of section 19a-111 of the statutes, the General Assembly required remedial health measures to be taken to prevent lead poisoning from occurring and directed the Commissioner of Health Services to establish such a lead poisoning prevention program. That statutory mandate does not contemplate that statutorily required abatement can be waived by any local official's issuance of a certificate authorizing apartment occupancy.
Closely related is the estoppel defense resting on the same factual grounds, namely, the issuance of the occupancy certificate, CT Page 5942 although lead paint conditions are no different now than when that certificate issued. It is the burden of someone claiming estoppel against a public agency to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge.Kimberly-Clark Corporation v. Dubno, 204 Conn. 137, 148,527 A.2d 1157 (1987). Since the defendant has not established his burden of showing that he had no convenient means of discovering the lead paint situation for himself, the court rejects this defense.
The defendant also claims that sections 10-4(5)(a), (b) and (c) of the Housing Maintenance and housing Code are unconstitutionally vague. That section provides:
 No person shall occupy as owner, occupant or let to another for occupancy any dwelling or dwelling unit, for the purpose of living therein, which does not comply with the following requirements:
 (5) No paint or other covering which does not conform to the standards of the American National Standards Institute, Inc.'s ANSI Z66.1-1964 (relating to liquid coating materials deemed suitable, from a health standpoint, for use on articles such as furniture, toys, etc., or for interior use in dwelling units where the dry film might be ingested by children) shall be used on any surface of any building used or intended to be used in whole or in part for human habitation which is accessible to children. Furthermore this paint:
 (a) Shall not contain lead compounds of which lead content (calculated as Pb) is in excess of one-half (1/2) per cent of the total weight of the contained solids (including pigments, film solids, and driers);
 (b) Shall not contain compounds of antimony, arsenic, cadmium, mercury, or selenium of which the metal content individually or in total (calculated as Sb, As, Cd, Hg, Se, respectively)is in excess of six-hundredths (0.06) per cent by weight of the contained solids (including pigments, film solids, and driers);
 (c) Shall not contain barium compounds of which the water-soluble barium (calculated as Ba)is in excess of one (1) per cent of the total barium in such coatings. CT Page 5943
 All painted portions of all buildings used or intended to be used in whole or in part for human habitation shall be kept free of cracked, chipped, blistered, flaking, loose, or peeling paint. Any such surface shall be completely cleaned of paint, and repainted with a paint or other covering conforming to the standards herein described. Where the director of health finds that the presence of cracked, chipped, blistered, flaking, loose or peeling paint constitutes a health hazard, or where upon inspection he discovers surfaces accessible to children to be coated with paint which does not conform with the standards accessible to children to be coated with paint which does not conform with the standards accessible to children to be coated with paint which does not conform with the standards of the American National Standards Institute, Inc.'s ANSI Z66.1-1964, he shall issue an order to the owner of the property upon which such hazard exists to eliminate such hazard under such safety condition as he may approve. Such paint shall be completely removed from any surface which can be chewed or eaten by children or is otherwise accessible to children. In lieu of removal of such paint, such surface shall be covered with a durable material or substance approved by the director of health. Repainting of any surface without prior removal of hazardous paint thereon or prior preparation of any surface in accordance with such conditions as the director of health may approve shall not be deemed to be satisfactory compliance with this section.
The court believes that this section speaks eloquently for itself. It has within it sufficient standards to pass constitutional muster. It provides sufficient objective guidelines with which the agencies charged with its enforcement can act. It is not unconstitutionally vague.
The defendant has also raised substantial questions concerning whether or not the plaintiff has misapplied enforcement provisions of the State Regulations regarding "intact surfaces," "chewable surfaces" and "defective surfaces" and whether these regulations are being interpreted with a draconian fervor unrelated to the letter of them or to common sense.
The court will not address those assertions by the defendant because a conflict of interest, violative of the regulations, makes the issuance of injunctive relief inappropriate.
Sections 19a-111-1 through 19a-111-11 of the Regulations of State Agencies set forth the regulations adopted by the State Health Department to implement General Statutes, Sec. 19a-111. Section CT Page 594419a-111-9 sets out over six printed pages of detailed requirements for the training and certification of lead inspectors and lead abatement contractors. The regulations themselves, section 19a-111-3(i), provide under the heading "Conflict of Interest that "[t]he lead inspector shall not be an owner or the lead abatement contractor for any property for which the lead inspector issues a lead inspection report." While the regulation does not so state, the court holds that the necessary logical implication of the stated language is that the lead inspector shall not offer to do the work either, as did the uncertified inspector in this case, because in offering to do the work which the regulation doesn't permit to be done by the inspector, the divided interest in an inspector which the regulation seeks to avoid is just as impermissibly present.
A conflict of interest regulation, such as that found in the Regulations of State Agencies preventing a lead inspector from being the contractor, is not a trifling part of this regulatory scheme. Acontractor may have an interest in expanding the work, a direct personal interest, which is distinct from the duty of aninspector which is to set out only those deficiencies in the premises which need to be abated. This entire enforcement action rests on a "plan of abatement" prepared by the inspector hired by the defendant which the health director seeks to enforce. The defendant is willing to make certain modifications to the premises but resists the scope and relatively massive expense of what is being ordered based on that report. The entire order against Mr. Groves which the city seeks to enforce hinges on his noncompliance with a certain plan of abatement which was prepared at Groves' request by Enviro Science. The court finds one aspect of this situation troubling. The regulation which prevents an inspector from being both inspector and contractor is designed to prevent two interests colliding, which could impede fair implementation of the statutory mandate to correct toxic lead paint sources in home environments. Someone who does such an inspection, which then becomes the fulcrum for the statutory and regulatory level of abatement, cannot offer to do the work because the more work that a person recommends as inspector, the more recompense that person receives as a contractor. In its May 6, 1993 letter to Mr. Groves, Enviro Science states: "Enviro Science Consultants, Inc. is capable of providing the follow-up services recommended in the Action Items." That offer to do the works calls into question the entire abatement plan recommended by the inspector.
The court declines to issue a permanent injunction, based on the enforcement proceeding generated by the Enviro Science report. CT Page 5945